TIMOTHY M. RIEDER

VERSUS

NEW ORLEANS AND BATON ROUGE
STEAMSHIP PILOTS ASSOCIATION

NO. 24-C-513

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA

FIFTH CIRCUIT COURT OF APPEAL
A TRUE COPY OF DOCUMENTS AS
SAME APPEARS IN OUR RECORDS

Linda Wiseman
First Deputy, Clerk of Court

December 13, 2024

Linda Wiseman
First Deputy Clerk

**IN RE** NEW ORLEANS AND BATON ROUGE STEAMSHIP PILOTS ASSOCIATION

**APPLYING FOR** SUPERVISORY WRIT FROM THE TWENTY-FOURTH JUDICIAL DISTRICT COURT, PARISH OF JEFFERSON, STATE OF LOUISIANA, DIRECTED TO THE HONORABLE ELLEN SHIRER KOVACH, DIVISION "K", NUMBER 811-905

Panel composed of Judges Susan M. Chehardy,
Stephen J. Windhorst, and John J. Molaison, Jr.

**WRIT DENIED**

In this writ application, relator, New Orleans and Baton Rouge Steamship Pilots Association ("NOBRA"), challenges the trial court's October 8, 2024 judgment denying its motion for partial summary judgment on the claim made by Timothy Rieder for permanent disability retirement benefits. For the following reasons, finding that an ambiguity in the contract between the parties exists, requiring the admission of parole evidence to clarify and resolve it—which raises issues of material fact and involves the weighing of evidence and credibility determinations of the witnesses—this writ application is denied.

**FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

Timothy Rieder is a former mariner and river pilot. NOBRA, who is governed by its Charter, is a river pilots' association commissioned by the State of Louisiana to pilot foreign flagged ships on the Mississippi River between New Orleans and Baton Rouge for a fee. Rieder first became a mariner in 2003, and a

member of NOBRA in April of 2004. As a part of his membership, Rieder was required to sign an agreement to abide by the terms of NOBRA's Charter. Article XIII(3) of the Charter provides for disability benefits in the event any member of NOBRA becomes disabled during the time he works as a river pilot rendering him unable to perform the duties of a river pilot.

In May of 2018, Rieder, who suffered from migraine headaches for the majority of his life, began experiencing physical issues associated with his chronic headaches, including migraine-induced visual auras and problematic sensations in his fingers and toes. These complaints apparently became more problematic over the next several months. In late November of 2018, Rieder notified NOBRA of his ongoing headaches that had worsened over time. He presented correspondence from his treating physician, Dr. Jay Mansfield, dated November 28, 2018, to NOBRA's regulator, the Board of Examiners ("BOE") for NOBRA, which correspondence provided the following:

> Mr. Rieder is a patient of mine and I have been treating him at the Center for Longevity and Wellness since April 2017. He has been a patient of this practice since 2009 and has been treated for migraines throughout this period. Recently he had a change in his symptoms that included visual disturbances and could interfere with his ability to safely operate heavy machinery. This makes him unable to safely perform his duties as a pilot until his condition is adequately treated. He will be evaluated and treated by a neurologist shortly, so once this physician feels he is fit to return to work he may resume his duties.

Dr. Mansfield's medical records include an office notation from December 3, 2018, wherein he states that Rieder's condition "could present a danger to the patient or the public if he has an episode while operating a ship." On December 4, 2018, NOBRA's BOE informed Rieder that, effectively immediately, he was prohibited from piloting vessels and should not resume doing so until it was determined by his treating physicians that he was physically fit to return to work. In January 2019, Rieder came under the care of neurologist, Dr. Colin Van Hook,

who also opined that Rieder's lifelong migraine headaches, now accompanied with visual disturbances, could "significantly impact normal activity."

As a result of Dr. Mansfield's November 28, 2018 letter, Rieder came under investigation by NOBRA's BOE for alleged violations involving his omission of diagnoses and medications to treat his longstanding history of migraine headaches from medical evaluation reports he had previously submitted to the United States Coast Guard ("USCG") on March 13, 2015, and May 1, 2018.[1] Rieder was informed by the BOE that it was reporting the discrepancies and his alleged omissions to the USCG. Thereafter, on April 4, 2019, the USCG found that Rieder's migraine headaches, accompanied with frequent auras and visual disturbances, and the pain medication to treat his affliction, rendered him "medically unfit for merchant mariner certification."[2]

In June 2019, the USCG served a complaint against Rieder seeking revocation of his Merchant Mariner Credentials ("MMC") based on allegations of alleged fraudulent misconduct by failing to disclose his history and treatment for chronic migraine headaches and for negatively answering questions in prior medical certifications regarding whether he currently, or had ever, experienced frequent headaches. On November 13, 2019, *in lieu* of facing those allegations in an administrative proceeding, Rieder entered into a Voluntary Surrender Agreement ("VSA") with the USCG wherein he voluntarily relinquished all rights to his MMC, thereby permanently forfeiting his river pilot's license. On December 3, 2019, the USCG's complaint against Rieder was dismissed as a result of the

---

[1]  Rieder was advised that he was being investigated for alleged violations of Title 46 – Professional and Occupational Standards, Part XLL. River Pilots, Subpart 3. Board of Examiners for the New Orleans and Baton Rouge Steamship Pilots, Chapter 63. Standards of Conduct, Section 6306. Violations of the Policy and section 3607. Standards of Conduct, Part A. 1. and 4.

[2]  From the record before us, it does not appear that Rieder has ever been released by his physicians as medically fit to return to work as a river pilot.

VSA. On December 6, 2019, Rieder was advised by NOBRA's BOE, that its investigation of Rieder's misconduct would nonetheless resume.

On January 2, 2020, Rieder submitted an application to NOBRA requesting permanent disability retirement benefits, and also physically surrendered his state pilot's commission that date.[3] On January 30, 2020, NOBRA denied Rieder's application, having determined that once he permanently relinquished his pilot's license to the USCG on November 13, 2019, in connection with the allegations of fraudulent misconduct, he ceased to be a NOBRA member and was, thus, no longer eligible to apply for membership benefits. Specifically, Rieder's counsel was advised the following:

> Mr. Rieder's application is denied because on November 13, 2019 Mr. Rieder voluntarily relinquished all rights to his United States Coast Guard (hereafter "U.S.C.G.") Merchant Mariner Credentials. The NOBRA Charter clearly states that, among other requirements, in order to be a *member* of NOBRA, a person shall maintain the requisite U.S.C.G. Merchant Mariner Credentials. [Emphasis supplied.]

After NOBRA denied his application for disability retirement benefits, Rieder filed suit against NOBRA, asserting breach of contract. In particular, Rieder alleged that he is entitled to short term sick leave benefits under NOBRA's Rule Book and permanent disability retirement benefits under NOBRA's Charter. Subsequently, NOBRA filed a motion for partial summary judgment on Rieder's breach of contract claim solely as it relates to permanent retirement disability benefits under its Charter. NOBRA argued that Rieder could not meet his burden

---

[3] It is unclear from the record, and the parties dispute, the effective date of Rieder's surrender of his Louisiana state pilot's commission. In a December 23, 2019 email to Rieder's counsel, counsel for NOBRA's BOE stated that "Rieder surrendered his New Orleans – Baton Rouge Steamship Pilot Commission (a copy of the original is attached and in your possession) to the Board of Examiner's . . ." The email further stated that "[u]pon receipt of the physical commission," NOBRA's counsel would advise the Governor's office that its investigation of Rieder was moot "as a result of Mr. Rieder surrendering his state commission and ceasing to be a member of the New Orleans – Baton Rouge Steamship Pilots." It appears that Rieder did not provide the "physical commission" to NOBRA until January 2, 2020, when he submitted his application for disability retirement benefits, and thus, arguably, NOBRA's investigation was not "moot" until that date, his state commission was not effectively "surrendered" until that date, and he did not cease to be a member of NOBRA until that date.

at trial on his breach of contract claim, when there was no obligation, and thus, no breach, under NOBRA's Charter since Rieder applied for permanent disability retirement benefits after he permanently forfeited his first-class USCG pilot's license and, as such, was no longer entitled to hold a share of NOBRA stock or exercise the rights of a shareholder.

In response, Rieder argued that the Charter was ambiguous, claiming there is more than one reasonable interpretation of when one ceases to be a "member" of NOBRA, such that he is no longer eligible to apply for member benefits. Rieder also argued that there is no provision in the Charter that states that a member immediately loses his membership when his pilot's license is suspended or lost. To this end, Rieder argued that, because there is more than one way to interpret the Charter, an ambiguity in the Charter exists, and that, as a matter of law, any ambiguity therein must be construed against NOBRA, as the party who created its text. Rieder further asserted that the Charter is devoid of a specific time limitation or deadline for a pilot to file an application for disability benefits. He claimed that he became disabled in November 2018, and was advised by NOBRA's BOE that he was physically unfit to pilot vessels while he was still a member of NOBRA, and since that time, he has never been released by his treating physician to return to duty as a river pilot. Accordingly, Rieder posited that his disability claim accrued on November 28, 2018, while he was still an active member of NOBRA, and prior to surrendering his USCG license on November 13, 2019, or his state pilot's commission on January 2, 2020, and, thus, he had a vested property right to disability benefits.

NOBRA's motion for partial summary judgment came for hearing on October 2, 2024. After hearing the argument of counsel, the trial court denied NOBRA's motion. A written judgment to that effect was issued on October 8, 2024, without written reasons. This writ application followed.

**ISSUE PRESENTED FOR REVIEW**

At issue in this writ application is whether a former river pilot, who after voluntarily and permanently surrendering his USCG license in *lieu* of facing administrative action brought against him by the USCG seeking to revoke his pilot's license for alleged fraudulent misconduct, is entitled to disability retirement benefits from NOBRA under its Charter, when the former pilot's permanent disability arose while he was still an active member of NOBRA and prior to surrendering his USCG license. While the parties concede that the facts are not in dispute with respect to this writ application, they disagree as to whether or not an ambiguity exists in the Charter; an ambiguity which would preclude the granting of a motion for summary judgment at this stage of the proceedings.

**DISCUSSION**

*Applicable Law*

Appellate courts review a trial court's ruling on a motion for summary judgment *de novo* under the same criteria that governs the district court's consideration of whether summary judgment is appropriate. *First Bank and Trust v. Redman Gaming of Louisiana, Inc.*, 13-369 (La. App. 5 Cir. 12/12/13), 131 So.3d 224, 227. A motion for summary judgment is a procedural device used to avoid a full-scale trial when there is no genuine factual dispute. *Pouncy v. Winn-Dixie La., Inc.*, 15-189 (La. APP. 5 Cir. 10/28/15), 178 So.3d 603, 605. Even though the summary judgment procedure is favored, it is not a substitute for a trial on the merits. *Joliboix v. Cajun Comfort, Inc.*, 16-414 (La. App. 5 Cir. 12/7/16), 207 So.3d 655, 658. A motion for summary judgment is properly granted if the motion, memorandum, and supporting documents show there is no genuine issue of material fact and the mover is entitled to judgment as a matter of law. La. C.C.P. art. 966(A)(3).

In considering a motion for summary judgment, courts cannot consider the merits, make credibility determinations, evaluate testimony, or weigh evidence. *Smith v. Our Lady of the Lake Hosp., Inc.*, 93-2512 (La. 7/5/94), 639 So.2d 730, 751. Specifically, credibility determinations are improper, as the credibility of a witness is a question of fact. *Hutchison v. Knights of Columbus*, 03-1533 (La. 2/20/04), 866 So.2d 228, 234. If the evidence presented is subject to conflicting interpretations, summary judgment is not proper. *Quigley v. T.L. James and Co., Inc.*, 595 So.2d 1235, 1237.

A contract constitutes the law between the parties. La. C.C. art. 1983. Interpretation of a contract is the determination of the common intent of the parties. La. C.C. art. 2045; *Bourgeois, Bennett, L.L.C. v. Gauthier, Downing, Labarre, Beiser & Dean, a P.L.C.*, 07-842 (La. App. 5 Cir. 3/11/08), 982 So.2d 124, 126. When the terms of the contract are clear and explicit, and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent and the contract must be enforced as written without resorting to extrinsic evidence. La. C.C. art. 2046; *Bourgeois*, *supra*. When a contract can be construed from the four corners of the instrument, interpretation of the contract presents a question of law that can be decided on summary judgment. *Id.* Conversely, a contract is ambiguous when its written terms are susceptible to more than one interpretation, there is uncertainty as to its provisions, or the intent of the parties cannot be ascertained from the language employed. When an ambiguity in a contract exists, parole evidence is admissible to clarify the ambiguity or show the true intention of the parties. *Village Shopping Center Partnership v. Kimble Development, LLC*, 18-740 (La. App. 5 Cir. 4/24/19), 271 So.3d 376, 382; *Lomark, Inc. v. LavigneBaker Petroleum, L.L.C.*, 12-389 (La. App. 5 Cir. 2/21/13), 110 So.3d 1107, 1111, *writ denied*, 13-654 (La. 4/26/13), 112 So.3d 848.

Interpretation of a contract and, specifically, the issue of whether a contract is ambiguous, is a question of law properly determined at the summary judgment stage. *Semco LLC v. Grand Ltd.*, 16-342 (La. App. 5 Cir. 5/31/17), 221 So.3d 1004, 1035, *writ denied*, 17-1291 (La. 11/6/17), 229 So.3d 475; *First Bank and Trust*, 131 So.3d at 228. The failure of a contract to provide for every possible alternative does not make the contract ambiguous. *Id*. When the meaning of a contractual provision is doubtful, the provision must be interpreted in light of considerations such as "the nature of the contract, equity, usage, and the conduct of the parties before and after the formation of the contract." La. C.C. art. 2053. However, in case of doubt that cannot otherwise resolved, a provision in a contract must be interpreted against the party who furnished its text. La. C.C. art. 2056.

### NOBRA's Charter

NOBRA is governed by its Charter. The BOE, or Board of Examiners, is NOBRA's "administrative arm." When Rieder became a member of NOBRA in 2004, he signed an agreement to abide by the terms of the Charter. The Charter provides that in order to be a member of NOBRA, a person shall maintain the requisite USCG Merchant Mariner Credentials and a Louisiana state river pilot commission. Specifically, Article IV provides, in pertinent part:

> (a) This corporation shall be organized on a capital stock basis, and the total authorized number of shares is one hundred fifty (150) of a par value of one hundred and No/100 ($100.00) Dollars each, which shall be paid for in cash.
>
> No person (the original incorporators herein excepted) shall be entitled to hold a share of stock of this corporation or shall ever exercise the rights of a stockholder, except on the following conditions, to wit:
>
> ***
>
> (2) Is a registered voter of the State of Louisiana.
>
> (3) Holds a first-class pilot's license of "any" gross tons (the word "any" as interpreted by the United States Coast Guard) for the Mississippi River, and from

Chalmette, Louisiana, to Baton Rouge Railroad and Highway Bride at Baton Rouge, Louisiana, issued to him by the United States Coast Guard.

***

(5) Shall not have reached his forty-fifth (45th) birth date.

***

(9) Submit to the Board of Directors a certificate from a competent physician certifying that he is in good health and physical condition.

Additionally, Article V of the Charter provides, in pertinent part:

***

(d) Whenever any member and shareholder of this Association shall be deprived of his Commission as a New Orleans – Baton Rouge Steamship Pilot, by either State or Federal Authority, or for any other reason, he shall ipso facto, cease to be a member of this Association, and his share of stock shall immediately become the property of this Association, and he shall be paid the amount of his share and all connections, rights and obligations between him and the Association shall cease and terminate …"

Article XIII (3) of the Charter provides for disability retirement benefits for any member of NOBRA in the event he becomes incapacitated rendering him unable to perform the duties of a river pilot.

In its writ application, NOBRA argues that Article IV(3) of its Charter clearly and unambiguously states that one must possess a first-class pilot's license to *ever* exercise the rights of a NOBRA stockholder. NOBRA posits that Article IV(3) can *only* be interpreted to mean that a pilot automatically ceases to be a member of NOBRA when he loses his USCG license. Consequently, NOBRA contends that, as of November 13, 2019, once Rieder voluntarily surrendered his river pilot's license to the USCG, he automatically ceased to be a member of NOBRA, no longer held a share of stock in NOBRA, and was, thus, no longer eligible to *ever* exercise the rights of a NOBRA stockholder, including the right to disability retirement benefits.

To the contrary, however, Rieder argues that another reasonable interpretation of Article IV, which contains nine subsections regarding membership requirements, is that it contains the prerequisites for *obtaining* membership, rather than *sustaining* membership. According to Rieder, in order to accept NOBRA's interpretation that, pursuant to Article IV(3), a pilot ceases to be a member of NOBRA when he loses his USCG license, one must also conclude that a pilot automatically ceases to be member if he ever experiences an issue with his voter registration, under Article IV(2); when he attains the age of 45, under Article IV(5); or, if he is ever unable to certify that he is in good health and physical condition, even if temporarily, under Article IV(9). When asked by both the trial court and this Court to reconcile "immediate cessation of membership" under Article IV(3) with Article IV(5), and other subsections, and to explain how the provisions of Article IV are more than prerequisites to NOBRA membership, counsel for NOBRA was unable to do so.

Moreover, the only provision of the Charter that expressly addresses the cessation of a pilot's *membership* in NOBRA *does not* expressly state that a pilot who loses his USCG license immediately ceases to be a member of NOBRA. Instead, it states that a pilot who is "deprived" of his *commission* as a NOBRA pilot "shall ipso facto, cease to be a member" of NOBRA. The deposition testimony of several witnesses admitted into evidence at the summary judgment hearing made it clear that there is a distinct difference between holding a pilot's license and holding a state commission as a river pilot; they are not the same thing. The testimony was that a pilot can lose his USCG license, yet still maintain his state commission and, thus, his membership in NOBRA. There was discussion about the distinction between a suspension of one's license versus the revocation of one's license, however, the Charter does not expressly make this distinction. Moreover, as previously noted, the record is not clear, and the parties apparently

do not agree, as to the date Rieder effectively surrendered his commission such that he ceased to be a member of NOBRA.

Based on our *de novo* review, we find NOBRA's Charter is ambiguous as to whether a pilot who loses his USCG license immediately ceases to be a member of NOBRA, and thus, as in the case of Rieder, is automatically ineligible to seek permanent disability retirement benefits. Because ambiguity exists in the Charter that cannot be reconciled by the language employed therein, even when read as a whole, one must turn to extrinsic or parole evidence to ascertain the true intent of the parties. Determining the intent of the parties becomes, in part, a question of fact that should properly be preserved for the trier of fact, because doing so would require the weighing of evidence and a determination as to the credibility of the witnesses. It is an underlying principle in consideration of motions for summary judgment that a trial court should not grant a motion for summary judgment if doing so requires it either to weigh evidence, make credibility determinations, or evaluate testimony. *Crescent City Property Redevelopment Association, LLC v. Muniz*, 21-371 (La. 6/1/21), 347 So.3d 682, 684.

For the foregoing reasons, we find the trial court did not err in denying NOBRA's motion for partial summary judgment as to Rieder's claim for permanent disability retirement benefits at this time. Accordingly, this writ application is denied.

Gretna, Louisiana, this 13th day of December, 2024.

**SMC**
**SJW**
**JJM**

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
STEPHEN J. WINDHORST
JOHN J. MOLAISON, JR.
SCOTT U. SCHLEGEL
TIMOTHY S. MARCEL

JUDGES

CURTIS B. PURSELL
CLERK OF COURT

SUSAN S. BUCHHOLZ
CHIEF DEPUTY CLERK

LINDA M. WISEMAN
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX



FIFTH CIRCUIT

101 DERBIGNY STREET (70053)

POST OFFICE BOX 489

GRETNA, LOUISIANA 70054

www.fifthcircuit.org

## NOTICE OF DISPOSITION CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE DISPOSITION IN THE FOREGOING MATTER HAS BEEN TRANSMITTED IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 4-6** THIS DAY **12/13/2024** TO THE TRIAL JUDGE, THE TRIAL COURT CLERK OF COURT, AND AT LEAST ONE OF THE COUNSEL OF RECORD FOR EACH PARTY, AND TO EACH PARTY NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

**CURTIS B. PURSELL**
CLERK OF COURT

**24-C-513**

### E-NOTIFIED

24th Judicial District Court (Clerk)
Honorable Ellen Shirer Kovach (DISTRICT JUDGE)
McClain R. Schonekas (Relator)          William P. Gibbens (Relator)
                                        Dominick F. Impastato, III (Respondent)

### MAILED

Benjamin O. Flaxenburg (Relator)
Attorney at Law
909 Poydras Street
Suite 1600
New Orleans, LA 70112